*470 OPINION OF THE COURT
Edward J. McLaughlin, J.
Introduction
Defendant, Richard Simone, is a former registered stockbroker on probation for having stolen money from a client. During the probation, the court learned from defendant that he had resumed trading and selling stocks and questioned him in court under oath about how he financed that activity. The information supplied by defendant was investigated by the District Attorney’s Office, which discovered that defendant had failed to inform the court that he was trading stocks as an authorized trading agent for five corporations. Thereafter, a probation violation specification was filed, alleging that defendant had violated probation by committing perjury when questioned by the court about his stock trading. After presiding over the probation violation hearing, the court concludes that defendant lied under oath, but makes no finding about whether he committed perjury.
Before defendant can be found in violation of probation for lying, the court must decide two issues. First, whether defendant’s sentence of probation contained an implied condition that he truthfully answer judicial questions about any stock trading that he conducted while on probation. Second, assuming that the answer to the first question is yes, did defendant receive sufficient notice that he allegedly had violated that condition when the probation violation specifications alleged that he had committed perjury instead of that he had lied to the court. The court rules against defendant on both issues and finds him in violation of his probation.
Findings of Fact
In 1995 and early 1996, defendant was a registered stockbroker at the now defunct A.R. Baron & Co. Inc. stock brokerage firm. During that time, the firm operated a massive criminal enterprise that stole millions of dollars from unsuspecting investors by fraudulently selling securities and manipulating stock prices. Defendant admitted stealing more than $800,000 from one client of the firm. He pleaded guilty to one count of grand larceny in the second degree and was sentenced to serve five years of probation and to pay a $5,000 fine.
On December 10, 1998, the day of sentence, defendant received a written copy of his probation conditions. The written conditions did not prohibit him from trading stocks. One of the *471 conditions required him to “answer all reasonable inquiries by the Probation Officer.” The written conditions did not state that defendant had to answer all reasonable inquiries by the court. The court did not announce such a condition on the day of sentence and no evidence exists that defendant was ever specifically informed of such a condition.
On December 2, 2002, defendant appeared in court without counsel to answer a violation of probation specification alleging that he had violated his probation by failing to notify the Department of Probation that he had changed his address. No probation violation hearing was conducted on that day. During the court proceeding, the court agreed with the Department of Probation’s liaison, who was in court, that this purely technical violation would not result in a revocation of probation, provided that defendant had paid the fine imposed as part of the sentence. Defendant informed the court that he had paid the $5,000 fine.
After learning that defendant had paid the fine, the court questioned defendant about his source of income and his Florida-based business, Simone Development. Defendant explained that he made “investments in real estate and the stock market.” The court asked defendant whether he was licensed to conduct that business in Florida. Defendant stated that he did not have a license but understood that he did not need a license “as long as I’m investing my own money.” He stated that he did not have any clients and therefore did not need to be licensed.
The court then asked how defendant had obtained the capital required to start his investment business. Defendant stated that his family had provided him with securities to start a margin account and that he had invested that money successfully during the late 1990’s. Defendant also explained that he ran this business from a room within a firm that helped him “clear” the trades. In exchange for the office space, the firm collected commissions on the trades that he completed.
In the next series of questions, the court inquired about the number of accounts that defendant had, asking him, “How many accounts do you have?” Defendant answered, “How many accounts do I have with them? I have two accounts with them, a personal account — .” The court interrupted defendant and said, “My question really is: How many accounts do you have, stock accounts?” The court then placed defendant under oath and asked, “How many accounts do you have?” Defendant answered, “I have four or five accounts . . . with three different brokerage *472 firms.” The court asked, “Trading exclusively for yourself?” Defendant answered, “Yes.”
In explaining his accounts, defendant stated that one of the accounts was a corporate account for Simone Development. When the court asked why defendant had a corporate account if he was trading for himself, defendant answered that the corporation had been established with money supplied by his father, so he was trading his father’s money. The court next asked defendant, “Apart from your father, do you send any money from your accounts to any other individuals?” Defendant replied, “No, I don’t sir.”
After the court concluded the inquiry, defendant said that he had been under the impression that his term of probation would end that day. The court acknowledged that had been a possibility, but stated, “But I think it goes without saying that not one of [the probation officials] asked anything like the questions that I just asked, and they’re responsible for supervising but I’m responsible for deciding and figuring it out, and I want to check some things out because if I found out that you’re investing somebody else’s money, I can get annoyed.” Defendant answered, “Okay. I swear under oath that I’m not, sir.”
On May 14, 2003, defendant appeared in court and was remanded based upon a declaration of delinquency alleging that he had engaged in financial management of funds exceeding $50,000 on behalf of persons other than family members and that he had committed perjury on December 2, 2002. On May 29, 2003, the People filed an amended declaration of delinquency that dropped the first allegation and added a second peijury allegation. In the amended declaration, the first specification alleged that defendant had committed peijury in the first degree by swearing falsely that he had been trading exclusively for himself, that he had not sent money from his trading accounts to any other person except his father, and that he was not investing anybody else’s money. The second specification alleged that defendant had committed peijury in the second degree because defendant’s statement that he traded exclusively for himself was inconsistent with an affidavit that defendant signed and submitted as part of an arbitration proceeding before the National Association of Securities Dealers. The court scheduled a probation violating hearing for June 6, 2003, but adjourned the hearing at defendant’s request. On June 12, 2003, the court conducted the violation of probation hearing.
*473 The Evidence at the Probation Violation Hearing
During the probation hearing, the court heard testimony from Jonathan Washburn, the Chief of the Proceeds of Crime Unit in the District Attorney’s Office, and a financial crimes investigator. His expertise as a financial crimes investigator was not disputed by the defendant, and the court fully credits his testimony. Based on Washburn’s testimony, the voluminous financial records admitted into evidence without defense objection, and the minutes of the court proceeding conducted on December 2, 2002, the court finds that the following facts have been established by a preponderance of the evidence. (See CPL 410.70 [3].)
Sometime between 1998 and 1999, defendant began trading securities on behalf of five companies located in the Isle of Man: Penham Limited, Broadside Limited, Chatton Limited, Cotmore Limited, and Stoneleigh Limited. The companies had been established by defendant’s wealthy uncle, Albert Gubay, with money from a trust fund created by him in 1994. The trust was administered by Peter Willers and Jonathan Peers, who informed Washburn that Mr. Gubay had arranged for the trust fund to finance defendant’s trading and had allowed defendant to trade on behalf of the five corporations to “keep his feet wet” in the American financial markets while defendant was on probation. The trustees would evaluate defendant’s performance after the probation ended and decide then whether “something more” could be arranged between defendant and the Isle of Man companies.
Between 1998 and May 2003, the trustees transferred $6 million into 10 brokerage accounts in the United States in the name of the five Isle of Man companies. This amount was a minuscule percentage of Mr. Gubay’s overall wealth and the wealth of the trust fund. Defendant received trading authorization over the funds in the brokerage accounts, but lacked signatory power to move the funds in and out of those accounts; that power was retained by the two trustees, Willers and Peers, who also acted as the directors for each of the five Isle of Man companies. In other words, under this arrangement, defendant independently could not transfer money between accounts. The trustees, located in the Isle of Man, moved funds in and out of those accounts at defendant’s direction. Defendant received no compensation for his trading, did not share in any profits from his trading, and drew no salary from the Isle of Man companies.
The trustees explained to Washburn that, at some unspecified time, defendant was expected to return the balances in the ac *474 counts to the trustees. No evidence exists in the record about defendant’s responsibility for potential losses from his trading. The trustees had contemplated an accounting at some point, but none had been scheduled either by the time the court had remanded defendant in May 2003 or when Washburn spoke with the trustees in the Isle of Man in preparation for the probation violation hearing. Neither Mr. Gubay nor the trustees seemed to have given possible losses any consideration. Defendant effectively was the custodian of money not his own, much as he had been as a broker, a position he apparently hoped to resume sometime after his probation.
Documentary evidence established that hundreds of thousands of dollars had been transferred from the Isle of Man brokerage accounts to a financial management account belonging to Simone Development. The statements for the Penham and Broadside accounts showed that money had been transferred from those accounts into an account at a Barclays bank in the Isle of Man. Bank statements and wire transfer confirmations show that the money flowed from there into the Salomon Smith Barney account for Simone Development. The statement for the Simone Development account at Salomon Smith Barney showed numerous wire transfers from Barclays bank, and that the amounts transferred equaled (minus a nominal transaction fee) the amounts of money that had flowed out of the Penham and Broadside accounts. According to initial calculations made by Washburn, approximately $378,000 had been transferred in that fashion between February 2001 and April 2003. Based on the financial records that the parties have stipulated into evidence, the court has calculated that up through December 2, 2002, at least $218,216.89 had been transferred in this manner, not including a payment of $1,090 in April 2001 from an Isle of Man account that had been paid directly to Citibank to pay defendant’s late credit card bill.
These transfers occurred without the knowledge of the trustees and were contrary to the terms of the informal arrangement. Defendant employed a ruse to trick the trustees into authorizing what appeared to be routine wire transfers of money from one Isle of Man account to another. He supplied the trustees with the name of an Isle of Man account into which the money should be deposited and an account number. Unbeknownst to the trustees, defendant had supplied the account number for Simone Development at Salomon Smith Barney, not the Isle of Man account. Based on the information supplied by *475 defendant, the trustees prepared a wire transfer that named an Isle of Man account as the recipient of the transfer, but which contained the account number for Simone Development. As Washburn explained, the ruse succeeded because, in his experience, banks routinely transfer the money into the account that matches the number on the transfer form rather than the name of the account. Several of the wire transfer confirmations were admitted into evidence at the hearing.
The financial management account at Salomon Smith Barney for Simone Development contained numerous debits for what appeared to be everyday personal expenses. For example, during the month of October 2002, the credit card activity included expenditures of $35.14 at Radio Shack; $23.99 at Segafredo Expresses $121.87 at Shoji Restaurant; $46.75 at Alton Sports in Motion; $95.76 at Café Ragazzi; $59.84 at Garcia’s Seafood Grill; $136.47 at Tonis Sushi; $99.20 at Numero Uno Hospitality; and $929.42 at Bed, Bath and Beyond. For 2002, those expenditures totaled $206,656.44 in withdrawals, credit card activity, and checks drawn on the account.
In papers submitted after the hearing, defendant relied on technical defenses to perjury to argue that he had not violated his probation as alleged in the first specification. First, invoking the “literal truth doctrine,” defendant argued that his statement that he did not send money from his account to “any other individual” was not perjurious because a corporate entity is not an “individual,” and that he cannot be guilty of perjury for not volunteering that he had transferred money to corporate and trust entities. Second, he argued that the question about whether he traded “exclusively for himself’ was directed at accounts held in his name and was too vague to be directed to accounts for the Isle of Man companies. Lastly, he contended that the question of whether he was trading “somebody else’s money” was too vague to apply to anything but trading money that belonged to the general public and did not apply to trading of family assets.[1]
In those posthearing papers, defense counsel also moved to reopen the hearing to submit an affidavit from defendant’s uncle, Albert Gubay. In the affidavit, Mr. Gubay averred that he had given defendant “permission and authority to deal with the *476 [trust] funds and my accounts as he saw fit.” He also averred that the amount provided to defendant for trading was less than 1% of the trust fund and that the trust fund “absorbed all profits and losses.” He averred additionally that Washburn had been informed that defendant had “ ‘carte blanche’ to do as he saw fit with the funds.” Mr. Gubay also averred that he had “no concerns” about defendant’s use of the money because the amount of money “would be repaid when the accounts were reconciled.” The court finds that the contentions in the affidavit that contradict Washburn are not accurate. They are an understandable, but unpersuasive postevent effort by Mr. Gubay to exonerate his nephew.
Conclusions of Law
Preliminarily, the court rules that a violation of probation finding is not barred simply because defendant did not receive written notice of the condition at issue as required by CPL 410.10 (1). The Legislature enacted that statute to ensure that the defendant has knowledge of the conditions imposed as part of probation (see People v Nazarian, 150 AD2d 923, 923-924 [3d Dept 1989]). A court may therefore find a defendant in violation of probation if the record establishes that the defendant had knowledge of the condition when the sentence was imposed, regardless of whether defendant received notice of the condition in writing (see id. at 923 [court announced conditions verbally at sentence and defendant received a written copy from probation officer later that same day]). Consequently, the validity of any violation of probation here depends on whether defendant had knowledge that his probation was conditioned on truthfully answering any judicial questions about any stock trading conducted while on probation.
Fundamental fairness and due process entitles a defendant to fair notice of the acts that can lead to a violation of probation (see United States v Dane, 570 F2d 840, 843 [9th Cir 1977]). Although an expressly stated condition provides a defendant with fair notice, an implied condition does not necessarily violate due process (see id.). For example, in many jurisdictions, courts have ruled that a sentence of probation contains an implied condition that the defendant refrain from criminal conduct (see e.g. State v Budgett, 146 NH 135, 137, 769 A2d 351, 353 [2001] [and cases cited therein]). The same rule exists in New York, where the CPL makes the commission of a criminal offense, not including a traffic infraction, a ground for revoking probation “irre *477 spective of whether such fact is specified as a condition of the sentence” (CPL 410.10 [2]).
The fair notice requirement is satisfied for an implied condition because an implied condition exists when knowledge of the condition may fairly be imputed to the defendant (see United States v Dane, 570 F2d at 844 [knowledge of the law is imputed to defendant along with understanding that violation of the law will result in revocation]). As the Practice Commentary to CPL 410.10 explains, actual notice that a sentence of probation is conditioned on leading a law-abiding fife is not required because the existence of that condition “should be obvious to any offender” (Preiser, Practice Commentaries, McKinney’s Cons Laws of NY, Book 11A, CPL 410.10, at 325 [1994]). As one court has stated, the requirement that a probationer lead a law-abiding life “is so basic and fundamental that any reasonable person [sentenced to probation] would be aware of such [a] condition” (State v Budgett, 146 NH at 137, 769 A2d at 353, quoting Brooks v State, 484 P2d 1333, 1334 [Okla Crim App 1971]).
This court rules that a probationer fairly can be charged with knowing that probation is conditioned on truthfully answering questions from the court about conduct reasonably related to the crime of conviction. Aside from the requirement that a probationer refrain from committing a crime, no requirement could be more basic and fundamental to probation than the requirement that a probationer be candid and truthful when speaking with the probation officer or the court. The written conditions of probation given to every defendant at sentence required the defendant to regularly report to a probation officer and to answer all reasonable inquiries from the officer about the defendant’s conduct (see Penal Law § 65.10 [3] [a], [c]). Although those written conditions do not include a similar condition for questioning conducted by the court, no reasonable person on probation could believe that the same condition did not apply to questions from the court (see State v Wolford, 1999 WL 76447, *7, 1999 Tenn Crim App LEXIS 139, *22 [Tenn Crim App, Feb. 18, 1999] [illogical to assume that probationer required to make full and truthful reports to probation officer could “make deliberate and inaccurate representations to the court”]). Indeed, the truth-telling requirement applies with more justification to questions asked by the court, which has the ultimate responsibility of deciding whether a probationer should remain on probation. And like the commission of a crime, *478 a probationer’s dishonesty with the court when questioned about conduct reasonably related to the crime of conviction shows a disrespect for the institution of the court and the administration of justice that is inconsistent with the rehabilitative goal of probation (see id. 1999 WL 76447, *8, 1999 Tenn Crim App LEXIS 139, *23 [“a probationer’s dishonesty with the trial court is an important measure in determining whether a probationary status is effective on this particular probationer”]).
In reaching this conclusion, the court recognizes that other courts have not applied the concept of implied condition to noncriminal conduct (see e.g. State v Budgett, 146 NH at 139, 769 A2d at 354; United States v Simmons, 812 F2d 561, 563 [9th Cir 1987]). But after examining the legal precedents on this topic, the court has not uncovered any reported case in which that rule was applied to a defendant who lied to the court about a matter directly related to probation. And, as already noted, one court has.ruled that lying to the court under that circumstance violates an implied condition of probation (see State v Wolford, 1999 WL 76447, 1999 Tenn Crim App LEXIS 139). Moreover, case law establishes that a court has discretion to revoke probation if the defendant perpetrated a fraud on the court or concealed information to induce the court to grant probation (see United States v Kendis, 883 F2d 209, 210-211 [3d Cir 1989] [defendant cited his making restitution to persuade court to grant probation, but did not reveal that he paid restitution with money converted from clients]; United States v Gray, 708 F Supp 458 [DC Mass 1989] [court granted probation in part because defendant falsely claimed he had been raped while incarcerated]). No reason exists why that rule should not apply to a defendant who lies or conceals information for the purpose of remaining on probation. Notably, defendant in this case thought that his probation would terminate on the day that he lied in court about his stock trading.
Having concluded that defendant’s probation included an implied condition that he truthfully answer all reasonable judicial inquires, the court must now decide whether defendant received notice of the alleged violation of probation as required by CPL 410.70. The notice required by GPL 410.70 contains two components: the defendant is entitled to “a statement setting forth the condition or conditions of the sentence violated” and “a reasonable description of the time, place and manner in which the violation occurred” (CPL 410.70 [2]). The facts of this case require that each component be analyzed separately.
*479 The notice provided to defendant satisfied the “reasonable description” component. The first specification alerted defendant to the time, place, and manner of the alleged violation, by having alleged that he had sworn falsely three times during a court proceeding on December 2, 2002, and by having identified the three allegedly false statements. Those allegations provided defendant with ample notice “of the particulars of the violation charged” (People v Schneider, 188 AD2d 754, 756 [1st Dept 1992]). No additional particulars were necessary to comply with the statute. As a result, the only remaining issue is whether defendant received a statement “setting forth the condition [of probation] . . . violated” (CPL 410.70 [2]).
This court has not found any reported appellate decision in this state addressing whether a probation violation specification adequately sets forth the condition violated if the specification does not precisely name the probation condition allegedly violated. In the absence of any specific precedent on this issue, the court rules that a purely technical defect in the notice does not prevent a court from finding a violation of probation and determining whether probation should be revoked (see Hammons v Sheriff of Jefferson County, Tex., 901 F2d 59, 60 [5th Cir 1990] [technical and nonprejudicial variances in parole revocation proceedings does not violate due process]; Perry v U.S. Parole Commn., 831 F2d 811, 813 [8th Cir 1987] [same]; Atkins v Marshall, 533 F Supp 1324, 1328 [SD Ohio 1982] [same]).[2] After all, the notice required by CPL 410.70 (2) is a component of the defendant’s general right to be heard before probation is revoked, and a defendant’s right to be heard is not violated by a defect in notice that does not prejudice the ability to present a defense at the probation hearing (see Gagnon v Scarpelli, 411 US 778 [1973]; People v Oskroba, 305 NY 113 [1953]).
The court finds that defendant was not prejudiced by the specification alleging that he had violated probation by committing perjury rather than by lying under oath to the court. This minor discrepancy did not hinder defendant’s ability to present a defense at the hearing. The perjury allegation no doubt motivated defendant to raise whatever technical defenses may exist to a peijury charge. But the allegations also should have motivated defendant to present a defense establishing — if he could — that the particular statements contained in the specifica *480 tion were not only nonperjurious but factually true. Defendant had the opportunity to make that case, and the court did not make any rulings that denied him the opportunity to show that the statements were true or that misled him to believe that the truthfulness of the statements was irrelevant to the outcome of the hearing. Having concluded that defendant had a fair opportunity to contest the charges against him, the court next explains why the evidence establishes that defendant lied to the court on December 2, 2002.
As defendant appeared in court on December 2, 2002, he knew that he had caused the transfer of a huge amount of money from the Isle of Man accounts into his Simone Development account. He had tricked the Gubay trustees into authorizing the transfer of that money. He also knew that truthful answers to the court’s questions likely would result in his theft being discovered by the court, the trustees, and his family; that his source of easy money would vanish; that his probation would be revoked; and that he could very well go to prison. As he appeared in court on December 2, 2002, defendant had a clear motive to lie about his stock trading.
The record shows precisely how defendant duped the Gubay trustees into transferring hundreds of thousands of dollars from the Isle of Man accounts to the Salomon Smith Barney Simone Development account. Defendant employed a scheme that manipulated the trustees into writing wire transfers that appeared on their face to send money to an Isle of Man account at Salomon Smith Barney, but which actually routed the money into the Simone Development account at the same institution. Under that scheme, he named one of the Isle of Man accounts as the beneficiary of the transfer, but the account number that he supplied to the trustees belonged to his own Simone Development account, and the bank deposited the money into the account that matched the number. Several of those wire transfer confirmations were examined by Washburn and were admitted into evidence at the hearing.
Contrary to defendant’s suggestion at the hearing, these transfers did not occur because of error. As of December 2, 2002, more than $200,000 had flowed into the Simone Development account. Yet the hearing record contains no evidence that defendant alerted the trustees to the existence of these transfers, tried to return this money to the Isle of Man companies, or took steps to prevent additional money from flowing into his account. An honest person would have taken any one of those steps had *481 the money found its way into that account by accident or mistake. Instead, defendant commingled the Isle of Man money with the money that he used to pay his personal expenses, and used the commingled funds to pay for everyday expenses.
Defendant’s scheme also provided him with a ready-made excuse for the transfers if they had been discovered at an early stage of the scheme. In each instance, defendant purportedly had directed the money to be deposited in an Isle of Man account at Salomon Smith Barney, the same place where defendant had his Simone Development account. If the transfers had been discovered the first time or soon thereafter, defendant plausibly could have claimed that he had given the trustees the wrong Salomon Smith Barney account number or that the transfer resulted from an internal mistake at Salomon Smith Barney. Defendant thus had devised a scheme that was carefully crafted to provide an excuse if the transfers were discovered but which could continue as needed if not discovered.
Taking into account defendant’s motive to lie, the court concludes that defendant did, in fact, lie when he stated that he had four or five stock accounts.[3] When he gave that answer, defendant knew not only that he had four or five personal accounts but that he was investing approximately $6 million as an authorized trading agent for the five Isle of Man companies. The court disagrees with defendant’s claim that the phraseology of the question — how many stock accounts do you have? — justified defendant’s believing that the question applied only to his personal accounts and not to accounts that he managed for the benefit of others. The court rejects the idea that defendant, a former registered stockbroker who stole hundreds of thousands of dollars from one client, genuinely believed that the court wanted information only about his own stock accounts but not about stock accounts that he managed for others. Rather, the court concludes that defendant understood, from the start of the inquiry, that the questioning applied equally — if not more so — to trading in nonpersonal stock accounts.
Defendant also lied when he stated that he was trading securities exclusively for himself. When defendant gave that answer, he was trading securities not only in personal accounts for his own benefit, but in corporate accounts for the five Isle of Man *482 companies. He traded in those corporate accounts for the financial benefit of the Isle of Man companies, not for himself. Undoubtedly defendant benefitted from the trading by gaining experience in trading, but he could not have genuinely believed that trading corporate funds in that context could be defined as trading “exclusively for himself.” The court finds that defendant did not tell the court about his trading in the Isle of Man accounts because he wanted to mislead the court into believing that he was trading money that belonged only to him or to his father.
Defendant again lied to the court when he denied having sent money to any other “individual” except his father. As a registered trading agent for the Isle of Man companies, defendant had directed Willers and Peers to send money from one Isle of Man corporation to another. Regardless of whether the word “individual” applies, for purposes of a perjury prosecution, only to another natural person, the court is not convinced that defendant genuinely believed that the court had defined the word that way in asking the question. And having lied earlier about the number of stock accounts under his control, defendant cannot now leverage that lie to argue that the answer was literally true for the funds contained in his own personal account. Consequently, the court is convinced that defendant lied by stating that he had not sent money to anyone other than his father and by failing to inform the court that he also controlled the movement of $6 million in corporate funds.
The final lie that provides a basis for a violation of probation is defendant’s denial that he was not trading “somebody else’s money.” The evidence establishes that defendant was, in fact, trading money that belonged to the Isle of Man companies and ultimately to Mr. Gubay. As noted already, defendant’s lie was part of his attempt to mislead the court into believing that he was trading only his own money or money loaned or given to him by his father. The court finds that defendant did not innocently believe that the “somebody else” question referred only to money from the general public and not to money from family members. In any event, defendant did not receive the money from Mr. Gubay for the purpose of conducting investing for his own personal financial benefit. He received authority to invest corporate money on behalf of a corporation, for the financial benefit of the corporation. No arrangement existed under which defendant would receive any of the profit realized from his trading of the Isle of Man accounts. Trading corporate *483 money on behalf of and for the financial benefit of a corporation cannot be equated with trading for personal financial gain money that was loaned by an immediate family member.
In light of the decision on the first specification, the court does not decide the second specification.

. The defendant’s arguments against finding a probation violation under the second specification will not be discussed here because the court’s probation violation finding is based solely on the allegations contained in the first specification.

. The standards for parole revocation and probation revocation are identical (see Gagnon v Scarpelli, 411 US 778, 782 [1973] [ruling that no difference in due process guarantees exists between revocation of probation and parole]).

. In evaluating the truthfulness of defendant’s responses on December 2, 2002, the court presumes truthful defendant’s statement that he did not need a license to trade securities in Florida if he was simply investing his own money.